**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

AJAY SOOD,

                Plaintiff,

v.                                              Case No. 22-2058-DDC

BRANDON BATES,

                Defendant.

_____

## MEMORANDUM AND ORDER

A Toyota test drive went awry after defendant Brandon Bates, a police officer, stopped plaintiff Ajay Sood. Instead of providing his license, plaintiff streamed the encounter to his Facebook, and—after some back and forth between the two—defendant physically removed plaintiff from the car and, eventually, to the ground. Plaintiff then sued defendant for using excessive force, and defendant now has moved for summary judgment against this claim (Doc. 59). That issue is fully briefed (Docs. 60, 72, 76) and the court grants the motion for reasons explained below.

## I.    Factual Background

The following facts either are stipulated in the Pretrial Order (Doc. 55), uncontroverted or, where controverted, stated in the light most favorable to plaintiff, as the party opposing summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

On February 16, 2020, plaintiff Ajay Sood took a white Toyota Rav 4 for a test drive from a car dealership in Merriam, Kansas. Doc. 55 at 2 (Pretrial Order ¶ 2.i.). During that test drive, defendant Merriam, Kansas Police Officer Brandon Bates observed plaintiff driving at about 15 miles per hour in a 45 miles per hour speed zone. *Id.* (Pretrial Order ¶ 2.ii.). Defendant

followed plaintiff and scanned the Rav 4's license plate which alerted him to an outstanding warrant.[1]  *Id.* (Pretrial Order ¶ 2.iii.).  Plaintiff exited the highway, I-35 South, onto an off-ramp, and took a wide turn onto 67th street in Merriam.  *Id.* (Pretrial Order ¶ 2.iv.).  After plaintiff took the wide turn, defendant initiated a traffic stop.  *Id.* (Pretrial Order ¶ 2.v.).[2]

Defendant turned on his emergency lights to pull over plaintiff, but plaintiff didn't stop immediately.  *See* Doc. 60-1 (Bates Dash Camera at 00:11–01:41).  Instead, plaintiff turned left off of 67th street onto West Frontage Road.  *Id.*  While waiting for the traffic light to turn onto West Frontage Road, plaintiff began filming on his cell phone while driving.  *See* Doc. 60-7 (Sood iPhone Video).  After turning left onto West Frontage Road, plaintiff still didn't pull over; defendant turned on his siren to signal that plaintiff should stop immediately.  Doc. 60-1 (Bates Dash Camera at 1:20–1:41).  Plaintiff still didn't stop.  *Id.*  Instead, he turned left from West Frontage Road into the car dealership.  *Id.*  But plaintiff still didn't stop immediately, so defendant, again, turned on his siren briefly.  *Id.* (Bates Dash Camera at 1:30–1:45).  After the second siren, plaintiff drove a bit farther down the dealership's driveway, and then he stopped. *Id.*

### *The Traffic Stop*

Defendant testified that he found plaintiff's failure to stop after multiple siren "chirps" unusual in his experience.  Doc. 60-2 at 9 (Bates Dep. 31:18–32:7).  After plaintiff stopped,

---

[1]     The warrant associated with the dealership car's license plate didn't arise from plaintiff or any of the passengers in the car with plaintiff during his test drive.  *See* Doc. 60-2 at 11 (Bates Dep. 39:8–14) (explaining that Joseph was the name of the person associated with the warrant).  This unfortunate coincidence wasn't plaintiff's fault, or defendant's fault.  Neither one of them could have known about the circumstances leading to the traffic stop.

[2]     A wide turn violates Kansas law.  Kan. Stat. Ann. § 8-1545(a)(1) ("The driver of a vehicle intending to turn shall do so as follows:  . . .  Both the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the roadway.").  Plaintiff doesn't contest that he made a wide turn.  Doc. 55 at 2 (Pretrial Order ¶ 2.iv.).

defendant approached plaintiff's vehicle.  Doc. 60-4 (Bates Body Camera at 1:00–1:20).

Defendant asked why plaintiff hadn't pulled over after defendant had "lit him up."  *Id.* (Bates

Body Camera at 1:20–1:30).  Plaintiff replied that he hadn't pulled over because it wasn't safe.

*Id*.  Plaintiff raised his phone up to the window and pointed its camera at defendant.  *Id.* (Bates

Body Camera at 1:32–1:34).  Defendant then pointed to plaintiff's phone and asked, "Why are

you filming me right now?"—behavior defendant found unusual for a traffic stop—and plaintiff

replied, "Oh yes, I will film you."  *Id.* (Bates Body Camera at 1:20–1:36); Doc. 60-2 at 15 (Bates

Dep. 54:1–20).  Defendant responded, "OK" and then explained that he pulled over plaintiff for

taking a wide turn when he exited I-35 South.  Doc. 60-4 (Bates Body Camera at 1:35–1:48).

Plaintiff asked, "Do you have a video?"  *Id.*  Defendant replied, "Yes, I do sir."  *Id.*  Plaintiff

responded, "I would like to see that."  *Id.*

       After explaining why he had pulled plaintiff over, defendant knocked on the Rav 4's rear

passenger window—a tinted window—and asked plaintiff, "Can you roll this window down for

me?"  *Id.* (Bates Body Camera at 1:48–2:02).  Concerned with his safety, the officer made this

request trying to discover if anyone else was in the car.  Doc. 60-2 at 11 (Bates Dep. 38:16–

39:3).  Plaintiff responded, "I cannot, I don't know how to do it."  Doc. 60-4 (Bates Body

Camera at 1:50–2:02).  Defendant gestured toward the window controls and explained, "I need

you to roll this window down for me so I can see who is back there."  *Id.*  Again, plaintiff

replied, "I don't know how to do it."  *Id.* (Bates Body Camera at 1:55–1:58).

       After this second refusal to roll down the window, defendant said, "I am going to pull

you out of this car in about two seconds if you don't roll this window down."  *Id.*  At this point,

plaintiff asked the person in the back seat how to roll down the window and the rear passenger

rolled down the window.  *Id.* (Bates Body Camera at 1:55–2:03).  Defendant then asked that

passenger for his name to confirm that he wasn't the person with an outstanding warrant associated with the car's license plate. *Id.* (Bates Body Camera at 2:03–2:08).

Defendant then asked plaintiff, "Do you have your license on you sir?" *Id.* (Bates Body Camera at 2:06–2:08). Plaintiff said, "I do." *Id.* (Bates Body Camera at 2:06–2:42). Defendant then asked, "OK, can I see your driver's license?" and plaintiff responded, "But what is the reason officer for that?" *Id.* (Bates Body Camera at 2:06–2:12). Defendant explained again that plaintiff had made a wide turn and then commanded: "Now show me your driver's license." *Id.* (Bates Body Camera at 2:06–2:14). Plaintiff didn't present his license; instead, he asked, "Wide turn where?" *Id.* (Bates Body Camera at 2:14–2:16). Defendant raised his voice and asked—for a fourth time—"Can I see your driver's license and proof of insurance?" *Id.* (Bates Body Camera at 2:16–2:18). Plaintiff told defendant he didn't need to yell. *Id.* (Bates Body Camera at 2:16–2:20). Defendant said, "Ok, I am asking you to do that right now, show me your driver's license." *Id.* (Bates Body Camera at 2:20–2:23). Plaintiff didn't provide his license and informed defendant, "You are on Facebook Live." *Id.*

### The Arrest

After asking five times for plaintiff's license with no success, defendant opened the driver's side door and instructed plaintiff to get out of the car. *Id.* (Bates Body Camera at 2:20–2:26). Defendant called for back up. *Id.* (Bates Body Camera at 2:26–2:28). Plaintiff didn't get out of the vehicle or indicate that he planned to do so—instead, he started to dig into his pant pockets with his free hand and continued to film using his cellphone with his other hand. *Id.* (Bates Body Camera at 2:20–2:42). Defendant told plaintiff to put his phone down. *Id.* (Bates Body Camera at 2:32–2:40). Plaintiff didn't. *Id.* (Bates Body Camera at 2:32–2:45). He continued to reach into his pocket. *Id.* Defendant, again, told plaintiff to get out of the car. *Id.*

4

(Bates Body Camera at 2:42–2:46).  Then, defendant raised his voice, and again said, "Get out of the car." *Id.* (Bates Body Camera at 2:42–2:49).

Plaintiff didn't get out of the car.  Defendant placed his left hand on plaintiff's left wrist and told him to get out of the car. *Id.* (Bates Body Camera at 2:48–2:56).  Defendant guided plaintiff out of the driver's seat and toward the back of the car. *Id.* (Bates Body Camera at 2:48–2:56).  Defendant attempted to handcuff plaintiff; he told him a few times to put his hands behind his back—to "give [him] his hands"—and to "stop" resisting. *Id.* (Bates Body Camera at 3:00–3:15).  Defendant radioed dispatch to inform them he had detained plaintiff, but plaintiff was resisting. *Id.*  Once defendant got both of plaintiff's hands behind his back, plaintiff started to yell about his blood pressure. *Id.* (Bates Body Camera at 2:55–3:32).

Defendant told plaintiff, "If you don't stop resisting, I am going to put you on the ground." *Id.* (Bates Body Camera at 3:20–3:25).  He then told plaintiff, "Stand up straight and give me both of your hands." *Id.* (Bates Body Camera at 3:24–3:30).  With both men standing behind the car, defendant struggled to get both of plaintiff's hands secured behind his back.  Doc. 60-1 (Bates Dash Camera at 3:00–3:50).  Then defendant took plaintiff down—bracing the fall by holding onto plaintiff's jacket and shoulder—where plaintiff landed on the grass. *Id.* (Bates Dash Camera at 3:50–4:08).  Once on the ground, another officer arrived to assist, and defendant was able to handcuff plaintiff. *Id.* (Bates Dash Camera at 3:24–5:30).  Plaintiff laid on his right side, then sat up to wait for medical care. *Id.* (Bates Dash Camera at 5:00–7:30).  After defendant had secured plaintiff's handcuffs, he used no further physical force on plaintiff. *Id.*

(Bates Dash Camera at 5:00–18:31).  Defendant cited plaintiff with a wide turn and "interference."[3]  Doc. 60-5 (Police Report).

While defendant spoke with other occupants of the car, plaintiff complained to officers that his handcuffs were too tight.  Doc. 60-4 (Bates Body Camera at 4:55–21:12); Doc. 60-7 (Officer Herron Body Camera at 13:25–13:41).  When defendant placed the handcuffs on plaintiff, he placed a finger between the cuffs and plaintiff's writs to ensure the handcuffs were appropriately loose.  Doc. 60-8 (Officer Meyers Body Camera at 2:00–2:07).  Later, another officer, Officer Herron, moved plaintiff's handcuffs to the front; when he did so, Officer Herron checked to make sure the handcuffs were fitting properly.  Doc. 60-7 (Officer Herron Body Camera at 13:06–13:41).

### Plaintiff's Medical Treatment

After the arrest, medical responders arrived on scene because of plaintiff's statements about his blood pressure.  Doc. 60-2 at 13 (Bates Dep. 47:20–48:8); Doc. 60-1 (Bates Dash Camera at 12:55).  Plaintiff asked the officers and responders on scene to take him to Overland Park Regional Hospital.  Doc. 60-7 (Officer Herron Body Camera at 8:49–9:02, 11:02–11:20, 11:35–11:45).  At Overland Park, the nurse tending to plaintiff informed other Merriam, Kansas police officers that plaintiff had sustained no injuries, and the hospital could discharge him.  Doc. 61-1 (Officer Fling Body Camera at 5:25–5:36).

Later that night—after Overland Park Regional Hospital had discharged him—plaintiff returned to the emergency room at Overland Park Regional, and he also went to AdventHealth Hospital's emergency room.  Doc. 60-10 at 56–57 (Sood Dep. 224:24–225:5).  While at

---

[3]     Kansas law criminalizes "Interference with law enforcement"—"knowingly obstructing, resisting or opposing any person authorized by law . . . in the discharge of any official duty."  Kan. Stat. Ann. § 21-5904(a)(3).

AdventHealth, plaintiff asked the doctor for an ace wrap and sling; the doctor advised against it, and warned a sling could "lead to more issues such as frozen shoulder[;]" but plaintiff requested the sling despite the doctor's recommendations, and he got one.  Doc. 61-2 at 5 (AdventHealth Emergency Room Record).  Plaintiff later sought chiropractic treatment for his injuries—among them, the chiropractor treated his "bilateral frozen shoulder[.]" Doc. 61-3 at 1 (Total Care Chiropractic 5/17/21 Letter).

### *Plaintiff's Alleged Injuries & Relevant Medical History*

Plaintiff claims that defendant damaged his left side from "sitting" on him.  Doc. 60-10 at 53–54 (Sood Dep. 212:18–213:9).  He asserts that his right side is fine.  *Id.*  Plaintiff also claims that the interaction with defendant caused injuries to his left shoulder, elbow, ribs, and knee.  *Id.* at 23 (Sood Dep. 89:1–12).  And plaintiff asserts that he had "markings" from the handcuffs when he went to the hospital.  *Id.* at 55 (Sood Dep. 218:13–19); *id.* at 58 (Sood Dep. 230:15–231:25).

Plaintiff had a history of reporting pain in his left side before his interaction with defendant on February 16, 2020.  *See* Doc. 61-5 at 2 (4/21/18 Medical Report of injury to left leg causing "ankle and knee pain"); *see id.* at 3 (12/21/17 Medical Report of "chronic pain" to plaintiff's left neck); *see id.* at 4 (9/8/17 Medical Report of "left sided pain in [plaintiff's] eye, head, neck, arm, side, hip and left leg").

## II.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625

F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).  To survive summary judgment, the non-moving party's

"evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

The federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

Plaintiff claims he is entitled to recover under 42 U.S.C. § 1983 because defendant acted under color of state law to deprive plaintiff of his constitutional rights.  Doc. 55 at 7 (Pretrial Order ¶ 4.a.i.).  His claim alleges that defendant used excessive force during the February 16, 2020, traffic stop.  *Id.* at 3 (Pretrial Order ¶ 3.a.).  Defendant now asks the court to grant summary judgment against this claim.

The court starts with the parties' threshold dispute:  whether plaintiff preserved a claim against defendant in his personal capacity.  Defendant argues that plaintiff only sued defendant in his official capacity, not in his individual capacity.  Then defendant argues, in the alternative, if plaintiff *did* sue defendant in his individual capacity, qualified immunity applies and shields defendant from liability.  Plaintiff asks the court to interpret his claim as one suing defendant in both his official and personal capacities.  Because the court concludes that plaintiff sued defendant only in his official capacity, as explained below, it need not engage in a qualified immunity analysis.  Thus, the court only addresses the parties' arguments about plaintiff's claim against defendant in his official capacity.

Defendant provides two reasons the court should grant summary judgment against plaintiff's official capacity claim.  First, defendant argues that plaintiff failed to plead and can't prove that any policy or custom of Merriam, Kansas caused his injury.  Next, defendant argues,

the court should grant summary judgment because defendant's use of force was objectively reasonable.  So, defendant argues, there's no dispute of material fact that a constitutional deprivation—excessive force—occurred in the first place.  Plaintiff argues the court shouldn't grant summary judgment against him because a genuine dispute of material fact exists whether a Merriam, Kansas policy or custom caused a constitutional deprivation.  The court addresses each argument, below.  But first, it addresses the threshold question about the scope of the claim.

### A.  Scope of § 1983 Claim

Defendant argues that plaintiff's claim is limited to a claim against him in his official capacity.  The Complaint asserts one claim against defendant:  excessive force violating 42 U.S.C. § 1983.  *See* Doc. 1 at 3–6 (Compl. ¶¶ 16–34).  The Complaint also specifies that "Defendant Brandon Bates . . . was at all times during the occurrences alleged in this petition an officer with the Merriam Kansas Police Department and is being sued in his official capacity." *Id.* at 1 (Compl. ¶ 3).  Defendant argues that because the Complaint specified that he sued defendant "in his official capacity" plaintiff can't pursue a personal capacity claim.

Plaintiff asks the court to interpret his claim as one that sues defendant in both his individual and official capacities.  Plaintiff argues that his Complaint "met the requirements for notice pleading under Fed. R. Civ. P. 8" and his allegations put defendant on notice that he'd face suit "in his individual and official capacity as those allegations implicate [defendant] directly[.]"  Doc. 73 at 10.

In *Johnson v. Oklahoma Department of Transportation*, our Circuit found that the complaint there, which announced—"[E]ach of the Defendants sued herein was the agent and employee of each of the remaining Defendants *and was at all times acting within the purpose and scope of such agency and employment*"—made "clear that he [sued] his supervisors in their

official capacities only." 645 F. App'x 765, 768 (10th Cir. 2016). The Circuit then cited approvingly a Sixth Circuit case holding that "when the complaint in a § 1983 action does not specify that a defendant is sued in her individual capacity, we have held that such a defendant has been sued in her official capacity only." *Id.* (quoting *Sanderfer v. Nichols*, 62 F.3d 151, 152 n.1 (6th Cir.1995))

Here, the Complaint is even more explicit than the complaint in *Johnson*. It clearly sues defendant in just his official capacity.[4] Doc. 1 at 1 (Compl. ¶ 3) ("Defendant Brandon Bates . . . was at all times during the occurrences alleged in this petition an officer with the Merriam Kansas Police Department . . . and is being sued in his official capacity."). Thus, the court concludes plaintiff sued defendant in his official capacity only. *See also Love v. Hayden*, 757 F. Supp. 1209, 1212 (D. Kan. 1991) ("Generally, where the plaintiff fails to expressly designate the nature of the suit in the complaint and identifies the defendants solely according to their job titles, the court must presume that the officials have been sued in their official capacities.").

Plaintiff's argument—that his pleading sufficed under Rule 8—would carry more weight if he simply had failed to specify the capacity in which he sued defendant. But it can't possibly suffice for a Complaint to specify that plaintiff is suing defendant "in his official capacity." Such a complaint provides no notice that defendant faces claims in both his individual and official capacity. Thus, the court evaluates plaintiff's claim here as one asserting only an official capacity claim.

---

[4]     The Pretrial Order supersedes the Complaint, of course, and it controls the subsequent course of litigation. Fed. R. Civ. P. 16(e). But the parties' briefing about the scope of the claim only discusses the Complaint, not the Pretrial Order. *See* Doc. 60 at 23–24; Doc. 73 at 9–10; Doc. 78 at 5–6. And there's no evidence that plaintiff—through the Pretrial Order—amended the assertion he made in his Complaint or otherwise gave defendant notice that he'd pursue an individual capacity claim. Also, importantly, plaintiff never raises this argument. The court can't make it for him. In fact, plaintiff makes no argument that the Pretrial Order preserved an individual capacity claim. He only argues that his Complaint sufficed under Rule 8.

**B. Official Capacity Claim**

Plaintiff claims that defendant, "acting under the color of state law," deprived plaintiff of his constitutional rights, violating 42 U.S.C. § 1983.  *See* Doc. 55 at 7 (Pretrial Order ¶ 4.a.i.). Defendant argues that the court should grant summary judgment against this claim for two reasons:  (1) plaintiff never pleaded and can't prove that a Merriam, Kansas policy or custom caused a constitutional violation; and (2) the uncontroverted facts show that defendant used objectively reasonable force—thus, no constitutional violation occurred in the first place.  Each provides an independent reason for the court to grant summary judgment against plaintiff's claim.  Because the court concludes that defendant's first argument disposes of plaintiff's claim, it doesn't reach the issue whether a constitutional violation occurred.

Defendant argues that plaintiff's official capacity claim fails because plaintiff hasn't pleaded and can't prove that a Merriam, Kansas policy or custom caused his constitutional deprivation.  Plaintiff contends that inheres in the summary judgment record a genuine issue of material fact over whether a Merriam, Kansas policy or custom caused a constitutional violation.

A claim against defendant in his official capacity—as a Merriam, Kansas police officer— functions as a claim against the City of Merriam, Kansas.  That's because "[s]ection 1983 does not authorize liability under a theory of respondeat superior."  *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Instead, a city "may be held liable under *Monell* if it executes an unconstitutional policy or custom, or a facially constitutional policy that causes a constitutional violation."  *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022) (citing *Monell*, 436 U.S. at 694).

Our Circuit instructs that a plaintiff suing a municipality under § 1983 for the acts of one of its employees—that is, pursuing a *Monell* claim—must show:  (1) "a municipal policy or

custom—either an official rule or one so entrenched in practice as to constitute an official policy[;]" (2) "that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy[;]" and (3) "that the policy directly caused his constitutional injury." *Id.* (internal citations and quotation marks omitted).

Defendant argues that the court should grant summary judgment against this claim because plaintiff's claim fails at the first *Monell* prong. Specifically, plaintiff is "'required to identify a municipal "policy" or "custom" that caused the plaintiff's injury[.]'" *See* Doc. 60 at 22 (quoting *Cuervo v. Sorenson*, No. 20-CV-0671-WJM-GPG, 2022 WL 4969692, at *6 (D. Colo. Oct. 4, 2022)). And plaintiff here fails to do so. A plaintiff can establish a "municipal policy or custom" in one of several forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation cleaned up).

Neither the Complaint nor the Pretrial Order contain allegations that a Merriam, Kansas policy or custom caused plaintiff's injury. In fact, neither document even mentions a policy or custom of the City of Merriam. Plaintiff's claim likely fails on the first *Monell* factor, but his summary judgment paper flags two Merriam, Kansas policies as the causes of his injuries. So, the court assesses plaintiff's arguments under the second and third *Monell* factors as well.

Plaintiff argues that the court shouldn't grant summary judgment against this claim because defendant's deposition establishes a genuine dispute whether a Merriam, Kansas custom

caused plaintiff's injury.  Plaintiff advances two factual theories about this testimony.  First, defendant testified that the City of Merriam allows its officers to "follow a vehicle as long as [they] find it necessary within [the] city limits."  *See* Doc. 60-2 at 6–7 (Bates Dep. 20:1-21:7).  And, because of "this custom of the Merriam Police Department, [defendant] followed [plaintiff] for a great distance . . . [which] resulted in [defendant] witnessing a minor traffic violation"— one, plaintiff argues, defendant used as a "pretext" to stop him.  Doc. 73 at 10.  Second, plaintiff contends, defendant wasn't adequately trained to deal with individuals with mental illness; and had he received training, "it is possible this interaction [between plaintiff and defendant] could have turned out differently."  *Id.* at 10–11.  Both arguments speculate a fair amount, but even if the arguments didn't speculate, neither can defeat summary judgment.  Both arguments fail to create a triable issue of either a causal link to a policy or deliberate indifference to a constitutional violation.

*First*, plaintiff's argument that the alleged custom to follow a car for an undetermined amount of time caused plaintiff's injuries asserts—at most—an attenuated causal link.  And plaintiff himself argues that defendant "following" his car "resulted in" defendant "witnessing a minor traffic violation"—thus, he concedes that the alleged custom caused a legitimate traffic stop.  *Id.* at 10.  But, he argues, defendant simply used the traffic stop as a pretext.  This allegation doesn't meet the "demanding standard of causation that we require in *Monell* cases, namely the 'direct causal link between the municipal action and the deprivation of federal rights.'"  *Finch*, 38 F.4th at 1246 (quoting *Brown*, 520 U.S. at 404); *see also Bryson*, 627 F.3d at 788 (explaining plaintiff must show "a direct causal link between the policy or custom and the injury alleged" (citation and internal quotation marks omitted)).  Plaintiff's first argument fails for another reason:  it doesn't create a genuine dispute that the municipality—Merriam,

Kansas—acted with deliberate indifference. *See Finch*, 38 F.4th at 1244 ("[A] plaintiff must show that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy." (citing *Crowson v. Wash. Cnty.*, 983 F.3d 1166, 1188 (10th Cir. 2020) (collecting Tenth Circuit cases on the deliberate indifference requirement))).

*Second*, plaintiff's argument that defendant wasn't adequately trained by the Merriam, Kansas Police Department falls short. Defendant testified that the City of Merriam requires its law enforcement officers to undergo forty hours of "crisis intervention training" designed to train officers about dealing with individuals with mental illness.[5] Doc. 60-2 at 5 (Bates Dep. 13:12–14:5). And defendant didn't complete his crisis intervention training until after the incident with plaintiff occurred. *Id.* Plaintiff argues that defendant's lack of training could've changed the course of events that led to his injury. Like plaintiff's first argument, this allegation falls short of the "demanding" causation standard—*i.e.*, a "'direct causal link between the municipal action and the deprivation of federal rights.'" *Finch*, 38 F.4th at 1246 (quoting *Brown*, 520 U.S. at 404). Plaintiff fails to create a triable issue about a "direct causal link between the policy or custom" and his alleged injuries. *See Bryson*, 627 F.3d at 788 (citation and internal quotation marks omitted). Speculation of that character isn't enough to defeat summary judgment.

Also, to pursue a § 1983 "failure to train" or "failure to supervise" claim, plaintiff would have to show that he has adduced facts permitting a finding that a Merriam, Kansas *policymaker* acted with deliberate indifference. *See Brown v. Gray*, 227 F.3d 1278, 1289 (10th Cir. 2000) (explaining that a "plaintiff must show that a policymaker, which could be the chief of police, among others, was deliberately indifferent"). "To demonstrate that a municipality acted with

---

[5]      Plaintiff contends that he was diagnosed with schizoaffective disorder before his interaction with defendant. *See* Doc. 73 at 11 (citing Def.'s Ex. 19). The court can't locate this diagnosis in the cited exhibit, but nonetheless accepts it as true for purposes of this summary judgment analysis.

deliberate indifference, a plaintiff may show that the municipality had 'actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation' and 'consciously or deliberately [chose] to disregard the risk of harm.'" *Finch*, 38 F.4th at 1244 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). Even when viewed in a light most favorable to plaintiff, the record here establishes just the opposite. It's undisputed that the City of Merriam, Kansas had no prior knowledge of any "incidents of alleged excessive force relating to" defendant. *See* Doc. 60-12 at 1 (Engel Aff. ¶ 5). Thus, plaintiff fails to create a dispute of material fact whether the Merriam, Kansas Police Department's purported failure to train defendant caused plaintiff's injury, or that anyone within the department acted with deliberate indifference.

## IV.    Conclusion

Plaintiff sued defendant in his official capacity only. Thus, plaintiff sued defendant as a representative of Merriam, Kansas. The court grants summary judgment against that claim because the record demonstrates no genuine dispute that a Merriam, Kansas policy or custom caused plaintiff's injury.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 59) is granted.

**IT IS SO ORDERED.**

**Dated this 1st day of August, 2023, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**